**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>         )<br>     Plaintiff, )<br>         )<br>  v.      )<br>         )<br>CORRY COMMUNICATIONS, *et al.*, )<br>         )<br>     Defendants. )<br>         )<br>         ) | C.A. No. 10-13 Erie<br>District Judge McLaughlin |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

On January 19, 2010, the United States of America instituted the instant action against Defendants Corry Communications, Inc. ("Corry Communications"), Mercyhurst College ("Mercyhurst"), the Commonwealth of Pennsylvania and Richard F. Rambaldo seeking more than $200,000 in unpaid taxes. This Court has jurisdiction pursuant to 28 U.S.C. § 1340 and § 1345, and 26 U.S.C. § 7402 and § 7403.

On April 22, 2010, this matter was referred to United States Magistrate Judge Susan Paradise Baxter for Report and Recommendation in accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1), and Rules 72.1.3 and 72.1.4 of the Local Rules for Magistrates. Default judgment was entered against Corry Communications on June 1, 2010 in the amount of $269,575.63 plus interest. The Commonwealth of Pennsylvania and Defendant Rambaldo were dismissed from this action by stipulation on June 4, 2010.

On February 11, 2011, the United States and the remaining defendant, Mercyhurst, filed cross-motions for summary judgment. On August 25, 2011, the

Magistrate Judge issued a Report and Recommendation wherein she recommended that the United States' motion for summary judgment be granted and that Mercyhurst's motion for summary judgment be denied. Mercyhurst filed objections to the Report and Recommendation on September 8, 2011, and the United States responded on September 22, 2001. For the reasons which follow, this Court declines to adopt the Magistrate Judge's Report and Recommendation and will instead enter summary judgment in favor of Mercyhurst.

## I. BACKGROUND

The following undisputed facts are gleaned from the Magistrate Judge's Report and Recommendation and the parties' submissions. Beginning in 2001, Corry Communications failed to pay various federal employment and unemployment taxes and, in response, the United States filed and attached federal tax liens against all property owned by Corry Communications. Included among the property owned by Corry Communications at that time were licenses to operate two radio stations: WWCB, later renamed WHYP, and still under operation of Corry Communications; and WEYZ. On March 30, 2005, Corry Communications sold WEYZ to Mercyhurst and the station was renamed WYNE. (Report and Recommendation, pp. 3-4). On April 1, 2005, the government sent a letter to Mercyhurst informing the college that the purchase of WEYZ/WYNE was subject to the federal tax liens which had attached to the station prior to the sale.

The assets that Mercyhurst acquired from Corry Communications included an FCC broadcasting license and radio transmission equipment. (Report and Recommendation, p. 4). The broadcast license was originally issued by the Federal Communication Commission ("FCC") to Corry Communications to allow it to broadcast radio programming at 1530khz during daytime hours. (Report and Recommendation,

p. 4).  On February 18, 2005, the FCC approved the assignment of WYNE to Mercyhurst.  (Report and Recommendation, p. 4).

On June 30, 2005, Mercyhurst applied to the Internal Revenue Service seeking a Certification of Discharge of Property from federal tax liens.  The IRS granted the Certification of Discharge on September 2, 2005 with respect to the tangible property acquired from Corry Communications, such as the radio tower, an A.M. radio transmitter, and related broadcasting equipment.  However, the Certification did not address the FCC broadcasting license.  (Report and Recommendation, p. 4).  As a result, the United States, in the instant lien foreclosure suit, asserts that a federal tax lien remains in existence with respect to the broadcasting license and seeks to foreclose on that lien to recover the unpaid taxes.

## II.  STANDARD FOR REVIEW

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact.  See Fed. R. Civ. P. 56(c); Krouse v. American Sterilizer Company, 126 F.3d 494, 500 n.2 (3rd Cir. 1997).  The moving party has the initial burden of proving to the district court the absence of

evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3rd Cir. 1990). Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3rd Cir. 1990) (quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990)).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Company v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3rd Cir. 1989) (the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." Firemen's Ins. Company of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3rd Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

### III.  ANALYSIS

The central issue in this case is whether the government can foreclose on an active FCC broadcast license as a result of a federal tax lien. In the Report and Recommendation, the Magistrate Judge, relying upon In re Atlantic Business & Community Dev. Corp., 994 F.2d 1069 (3rd Cir. 1993), answered this question in the affirmative. Before discussing the Third Circuit's holding in Atlantic Business, however, a brief summary of the caselaw regarding whether and to what extent a lien may be placed on an FCC broadcast license is appropriate.

Historically, the FCC took the position that no security interest could attach to an FCC broadcast license in any manner. See In re TerreStar Networks, Inc., 2011 WL 3654543 (Bankr.S.D.N.Y. 2011) (collecting cases). In In re Merkley, for example, the FCC announced that "a broadcast license, as distinguished from the station's plant or physical assets, is not an owned asset or vested property interest so as to be subject to a mortgage, lien, pledge, attachment, seizure, or similar property right." In re Merkley, 94 F.C.C.2d 829 (1983). The FCC articulated that "such hypothecation endangers the independence of the licensee who is and who should be at all times responsible for and accountable to the Commission in the exercise of the broadcasting trust." Id. at 830-31. Consistent with this position, courts generally refused to allow any security interest to attach to a broadcast license. See Stephens Industries, Inc. v. McClung, 789 F.2d 386, 390 (1986) (holding that an FCC license could not be used as collateral to secure a mortgage); In re Radio KDAN, Inc., 11 F.C.C.2d 934 (1968) ("The extraordinary notion that a station license issued by this Commission is a mortgageable chattel in the ordinary commercial sense is untenable."); In re Tak Communications, Inc., 985 F.2d 916, 918-19 (7th Cir. 1993) (recognizing longstanding FCC policy "precluding creditors from holding security interests in broadcasting licenses."); Kidd

Communications v. FCC, 427 F.3d 1, 5 (D.C. Cir. 2005) (acknowledging that the FCC's decisions have consistently held that a broadcast license is not subject to a "mortgage, security interest, or lien").

Over time, however, some courts began to recognize "a limited right of a license holder to grant a security interest in the *proceeds* of an FCC-approved transfer of the license to a third party." In re Tracy Broadcasting Corp., 438 B.R. 323, 328-29 (Bankr.D.Col. 2010) (emphasis added) (citing In re Ridgely Communications, Inc., 139 B.R. 374, 378-79 (Bankr.D.Md. 1992) (holding that the FCC policy against security interests on broadcast licenses implicates rights between the licensee and the government that are not at issue with respect to proceeds of a sale following a transfer); MLQ Investors, L.P. v. Pacific Quadracasting, 146 F.3d 746, 748 (9th Cir. 1998) (same)). Underlying this distinction is the principle that, while the right to operate conveyed by an FCC-approved broadcast license is a "public right," the right to receive proceeds from an approved transfer of the license is entirely private. See In re Tracy Broadcasting, 438 B.R. at 328; MLQ Investors, 146 F.3d at 748. In In re Ridgely, for example, the court distinguished between the licensee's private right to receive economic value generated by an FCC license and the FCC's public right to "preserv[e] its regulatory authority over licensees and over the transfer of broadcast licenses." In re Ridgely, 139 B.R. at 378-79. The court concluded that a security interest over the right to proceeds from an FCC broadcasting license did not disrupt the FCC's regulatory power because the secured creditor could not "initiate an involuntary transfer of the license to the creditor [] or to compel the initiation of a transfer or assignment of a license to a private third party." Id. at 379.

In response to the conflict between those decisions permitting a lien over only the private economic value of a license, and those rejecting *any* attempt to impose a

6

lien on a broadcast license, the FCC issued the following declaratory ruling in In re Cheskey:

> The Commission has a policy against a licensee giving a security interest in a license. In re Kirk Merkley, 94 F.C.C.2d 829 (1983). The reason for the policy is that the Commission's statutory mandate requires it to approve the qualifications of every applicant for a license. 47 U.S.C. § 310(d). If a security interest holder were to foreclose on the collateral license, by operation of law, the license could transfer hands without the prior approval of the Commission.
>
> In contrast, giving a security interest in the proceeds of the sale of a license does not raise the same concerns. When a licensee gives a security interest in the proceeds of the sale of the system, including the license, the licensee's creditor has rights with respect to the money or other assets the licensee receives in exchange for the system and license. The creditor has no rights over the license itself, nor can it take any action under its security interest until there has been a transfer which yields proceeds subject to the security interest. Thus, when the creditor exercises his security interest, the licensee will no longer be holding the license.

In re Cheskey, 9 F.C.C.R. 986, 987 (1994).  Since that time, courts have widely deemed it "settled law" that "a creditor may perfect a lien in the private economic value of an FCC license to the extent that such lien does not violate the FCC's public right to regulate license transfers."  In re TerreStar Networks, Inc., 2011 WL 3654543 at *7; see also MLQ Investors, 146 F.3d at 748 (permitting a security interest in the economic value attached to an FCC broadcasting license but not over the active license); In re Beach Television Partners, 38 F.3d 535, 537 (11th Cir. 1994) ("A security interest in the proceeds of an FCC-approved sale of a broadcast license in no manner interferes with the FCC's authority and mandate under the Act to regulate the use of broadcast frequencies."); In re Ion Media Networks, Inc., 419 B.R. 585, 602 (Bankr.S.D.N.Y. 2009)

("FCC licenses . . . are subject to an enforceable dedication of their economic value . . ."); In re Media Props., 311 B.R. 244, 250-51 (Bankr.W.D.Wisc. 2004) ("After those prerogatives exclusive to the FCC are carved out, there remains an interest in the license which may be subjected to a security interest which would continue in proceeds of those interests by operation of law); In re Thomas Communications, Inc., 166 B.R. 846, 849 (S.D.W.Va. 1994) (holding that "creditors in this case could possess a security interest in the proceeds from the sale of broadcast licenses issued by the FCC"); see also In re Tracy Broadcasting, 438 B.R. at 328 (assuming *arguendo* that a licensee may grant a security interest in the proceeds of a broadcast license transfer); In re Ridgely, 139 B.R. at 379 ("[A] creditor may perfect a security interest in a debtor's F.C.C. broadcasting license, limited to the extent of the . . . right of the creditor to claim proceeds received by the debtor licensee from a private buyer in exchange for the transfer of the license to that buyer."). In contrast, no federal court has ever permitted a private creditor or the government to foreclose on an *active* broadcasting license in order to satisfy a lien. Indeed, a handful of courts continue to reject any attempt to impose a lien over any portion of a license. In re Tak Communications, 985 F.2d at 918-19; Kidd Communications, 427 F.3d at 5.

In Atlantic Business, the owner of an AM radio station operating pursuant to an FCC broadcast license sought bankruptcy protection under Chapter 11 of the Bankruptcy Code. Atlantic Business, 994 F.2d 1071. Prior to the bankruptcy filing, the government had perfected federal tax liens on behalf of the IRS against the station based on the station's failure to pay employment taxes. Id. at 1070-71. Upon subsequent conversion to a Chapter 7 proceeding, the bankruptcy court authorized the sale of all of the assets of the radio station, including the broadcast license. Id. at 1071. An agreement of sale was reached whereby the station and its broadcast license were transferred to a purchaser for $350,000, with the broadcast license being

8

valued by an appraiser at $250,000. Id. Following the sale, the trustee instituted an adversary action to determine whether the government had any interest in the proceeds from the sale of the license and station by virtue of its federal tax liens. Id. The bankruptcy court ruled that the FCC license "did not qualify as property or an interest in property to which a tax lien could attach under section 6321[1] of the IRS Code" and the district court affirmed. Id.

The Third Circuit reversed, stating that "the policy behind the FCC's refusal to recognize liens obtained by private creditors against a broadcasting license is not applicable to the IRS's assertion of a secured claim in bankruptcy *against the proceeds* of a bankruptcy sale." Id. at 1070 (emphasis added). The Court began its analysis by analogizing FCC broadcasting licenses to state liquor licenses which "both federal and state courts have held are property within the reach of section 6321's lien." Id. at 1072 (citing, e.g., 21 West Lancaster Corp. v. Main Line Restaurant, Inc., 790 F.2d 354 (3rd Cir. 1986) (involving a Pennsylvania liquor license)). For example, in 21 West Lancaster, the Third Circuit had previously held that a Pennsylvania liquor license was an interest in property subject to section 6321's lien because "it was alienable and had value" despite state restrictions on alienability. 21 West Lancaster, 790 F.2d at 356-58. Based on these same factors, the Atlantic Business court held that a "broadcasting license is section 6321 property analogous to the liquor license we dealt with in 21 West Lancaster Corp" because "[b]oth are granted at the discretion of the government, both are of limited duration, and both can be revoked for cause." Atlantic

---

[1]   26 U.S.C. § 6321 provides that:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such a person.

Business, 994 F.2d at 1075. The Third Circuit concluded, therefore, that "the district court and the bankruptcy court erred in holding that an FCC license is not property within the reach of section 6321." Id. at 1076.

The Third Circuit specifically noted that the IRS lien at issue in Atlantic Business "attache[d] only to the proceeds of a transfer [that] the FCC has approved," rather than to an active broadcast license, reducing the "threat to the independence of the bankrupt licensee or the transferee of the license." Id. at 1074-75. In this regard, the Court acknowledged caselaw which had previously recognized a limited right of a license holder to create a security interest in the proceeds of an FCC-approved transfer of a broadcast license. Id. at 1075 n. 7 (citing In re Ridgely, 139 B.R. at 378-79). Further, the Third Circuit explicitly limited its holding to those situations where a security interest is asserted over the proceeds of a broadcast license transfer that had already been approved by the FCC:

> This case does not require us to reach the question whether the IRS could foreclose its lien against an active station by seizure of its license. A seizure of the license before FCC approval of any transfer has occurred poses issues not present in a case involving a right to the proceeds of a sale of a broadcast license.

Atlantic Business, 994 F.2d at 1075 n. 7. The Third Circuit further supported its decision to allow a security interest to attach to the proceeds derived from the sale of the license at issue by noting that the lienholder in that case was the government, rather than a private creditor. Atlantic Business, 994 F.2d at 1074. In so doing, the Court opined that the danger underlying the FCC's historical prohibition of any type of lien on a broadcast license – the risk that a private party with a lien might gain "control over the license that it might exercise contrary to the public interest the FCC was created to protect" – is "attenuated when the government asserts the interest and the risk of

influence antithetical to the public is reduced, if not eliminated." Id. As a result, the Court permitted the IRS to assert its lien against the proceeds generated by the sale of the license.

In the thorough Report and Recommendation of the Magistrate Judge, she cites Atlantic Business for the proposition that a broadcast license is itself property to which a lien may attach:

> The Third Circuit's ruling in Atlantic Business is still alone in its holding that a broadcast license is property to which a lien may attach. Because of this, both parties to these motions have attempted to use or distinguish it on its facts and reasoning, or, in Mercyhurst's case, point to the wealth of case law holding to the contrary. Nonetheless, this lone decision is precedential to our review and its ruling is unmistakable; the broadcast license is property to which a lien may attach.

(Report and Recommendation, p. 5). As a consequence, the Magistrate Judge held that the IRS was entitled to foreclose on the license because "it makes little sense to find broadcast licenses to be property for § 6321 purposes, to permit the filing of such liens by the United States against such property, but then to prohibit the United States from action to foreclose on such liens." (Report and Recommendation, p. 10).

In my view, however, the Report and Recommendation ignores the well-established distinction, discussed above, between the public right to operate conveyed by an FCC-approved broadcast license and the private right to receive proceeds from an approved transfer of that license. This distinction is critical because the procedural posture and narrow holding of the Atlantic Business decision place it squarely within the line of cases which have allowed a creditor to impose a lien on the proceeds of the sale of a broadcast license. See In re Tracy, 438 B.R. at 328 (noting that "settled law" prohibited foreclosure on a lien over an active broadcast license but

recognizing that "several cases have recognized a limited right of a license holder to grant a security interest in the proceeds of an FCC-approved transfer of the license."). As explained in Cheskey, a creditor holding a lien over the economic value of a broadcast license "can [not] take any action under its security interest until there has been a transfer which yields proceeds subject to the security interest. Thus, when the creditor exercises his security interest, the licensee will no longer be holding the license."  Cheskey, 9 F.C.C.R. at 987; see also In re Tracy Broadcasting, 438 B.R. at 328; In re Ridgely, 139 B.R. at 379 ("[A] creditor may perfect a security interest in a debtor's F.C.C. broadcasting license, limited to the extent of the . . . right of the creditor to claim proceeds received by the debtor licensee from a private buyer in exchange for the transfer of the license to that buyer.").

To reiterate, no federal court has ever held that a secured creditor, whether private party or governmental entity, can foreclose on an active broadcast license to satisfy its lien.  The Third Circuit made it clear that it was not passing on that issue. For the reasons previously discussed, I find that neither the Atlantic Business opinion itself, nor the previously described caselaw from other jurisdictions, supports the Report and Recommendation's expansive interpretation of Atlantic Business.  Consequently, I conclude that the IRS may not foreclose on Mercyhurst's active broadcast license in this case.

## IV.  CONCLUSION

Consistent with the foregoing, I find that the government cannot foreclose upon and force the sale of the WYNE broadcast license.  As such, I decline to adopt the Magistrate Judge's Report and Recommendation.   An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>　　　　　Plaintiff, )<br>　　v. )<br>)<br>CORRY COMMUNICATIONS, *et al.*, )<br>)<br>　　　　　Defendants. )<br>)<br>) | C.A. No. 10-13 Erie<br>District Judge McLaughlin |

# **ORDER**

AND NOW, this 30th day of September, 2011, this Court having undertaken a *de novo* review of the complaint and the documents in this case, together with the Report and Recommendation, the Defendant's objections to the R&R, and the Plaintiff's response thereto,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED. Judgment is entered in favor of Defendant. This matter is closed.

　　　　　　　　　　　　　　　　　　　　　　/s/ Sean J. McLaughlin
　　　　　　　　　　　　　　　　　　　　　　United States District Judge

cm:　　All parties of record. ___
　　　　U.S. Magistrate Judge Susan Paradise Baxter